# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| LAURA RUDDY,<br>　　　　Plaintiff, | ) <br> ) <br> ) |
| v. | ) 　Civil No. 1:18-cv-1480 |
| | ) |
| BLUESTREAM PROFESSIONAL<br>SERV., LLC, *et al.*,<br>　　　　Defendants. | ) <br> ) <br> ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Laura Ruddy has sued her former employer Defendant Bluestream Professional

Services, LLC ("Bluestream") and Defendant KGP Telecommunications, Inc.[1] (collectively,

"defendants") for sex and pregnancy discrimination under Title VII of the Civil Rights Act of

1964 ("Title VII") and the Pregnancy Discrimination Act ("PDA"),[2] as well as retaliation under

Title VII, the PDA, and the Family Medical Leave Act of 1993 ("FMLA"). Defendants filed a

motion for summary judgment on each count of plaintiff's complaint. Defendants' motion has

---

[1] Defendants note that KGP Telecommunications, LLC was improperly named as KGP Telecommunications, Inc. Although plaintiff has named both Bluestream and KGP Telecommunications as defendants, the record does not disclose that plaintiff was employed by KGP Telecommunications. The record does disclose that there was a relationship between Bluestream and various "KGP" titled entities – KGP Logistics and KGPCo – but the nature and extent of these relationships is largely unexplained. Defendants have not moved for summary judgment on the basis that KGP Telecommunications is not a properly named party.

[2] Although plaintiff asserts that she is bringing sex and pregnancy discrimination claims under both Title VII and the PDA, her complaint makes clear that both claims are based on her pregnancy and that she does not seek to assert a cause of action under each statute. *See* Compl. ¶ 42 (alleging that plaintiff "was terminated because she was pregnant (and therefore because she was female)"). Specifically, Title VII was amended to include pregnancy discrimination within the meaning of sex discrimination. *See* 42 U.S.C. § 2000e(k) (the term "because of sex" includes "on the basis of pregnancy, childbirth or related medical conditions"). Courts have therefore recognized that a plaintiff does not have two causes of action, one under Title VII and one under the PDA, where the claims are based on the same discriminatory conduct, namely pregnancy. *See, e.g., Chernova v. Elec. Sys. Servs., Inc.*, 247 F. Supp. 2d 720, 722 (D. Md. 2003) ("The PDA does not provide a separate cause of action."); *Jarrett v. Nobel Learning Communities, Inc.*, No. 12 C 9432, 2014 WL 1612610, at *3 (N.D. Ill. Apr. 21, 2014). Here, plaintiff does not allege that she suffered any sex discrimination separate and apart from her allegations of pregnancy discrimination. Accordingly, although plaintiff frames her claims as being brought under both statutes, the analysis will focus solely on Title VII, which incorporates the PDA.

been fully briefed and argued orally, and thus is ripe for disposition.

## I.

The entry of summary judgment is appropriate only where there are no genuine disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, it is important to identify the record facts as to which no genuine dispute exists. In this regard, Local Rule 56(B) directs a movant for summary judgment to include in its submission a separately captioned section listing in numbered-paragraph form all material facts as to which the movant contends no genuine dispute exists; the nonmovant must then respond to each paragraph citing admissible record evidence to establish a genuine dispute of material fact. In this case, both parties have substantially complied with the Local Rule. Accordingly, the facts recited herein are derived from defendants' list of material facts and plaintiff's response to those facts, noting where plaintiff disputes facts and whether that dispute is genuine and material.

1. Bluestream provides planning, implementation, and maintenance services for wireless, wire line, broadband cable, and data center networks in the United States.

2. Bluestream maintains a company policy that allows employees to raise complaints when an employee believes that he or she has been subjected to unlawful harassment. According to the policy, when a complaint of illegal harassment is made, the Director of Human Resources will undertake a confidential investigation.

3. On August 6, 2015, Scott Della Valle, Vice President of Operations of Mobility Services for Bluestream, hired plaintiff as a recruiting manager.

4. Della Valle had worked with plaintiff previously at another company and recruited plaintiff for the recruiting manager position after she left her former company.

5. Della Valle hired plaintiff at a salary of $90,000 per year.

6. Plaintiff was hired to perform "full cycle recruiting," a process which involved recruiting, interviewing, and hiring candidates for internal positions with Bluestream.[3]

---

[3] Defendants rely on the declaration of Tara Taylor, Director of Human Resources, to support this fact. Plaintiff disputes that she was hired to perform "full cycle recruiting" and asserts that Taylor lacks a proper foundation to know for what plaintiff was hired because Taylor was not at Bluestream at that time. Accordingly, there is no genuine dispute of material fact here as plaintiff fails to offer any evidence that she was *not* hired to perform full cycle recruiting and plaintiff's deposition testimony supports that she was hired to perform the tasks that Taylor identifies as part of full cycle recruiting. *See* Ruddy Depo. Tr. at 65:6-22 (explaining internal requisition work and stating that it took up one hundred percent of her time when she was hired).

7. At all times relevant to this matter, the expense associated with plaintiff's employment at Bluestream was allocated to the Mobility Services unit, which was Della Valle's responsibility.[4] Plaintiff understood that she was initially on the Mobility Services unit budget, but that she was at some later point transferred to the corporate budget.

8. Initially, plaintiff performed only the recruiting manager duties for which she was hired.

9. In October 2015, Director of Human Resources Tara Taylor was assigned to be plaintiff's direct report from a technical standpoint and her position was reflected on the corporate budget. Otherwise, however, no aspect of plaintiff's job changed, including her compensation, the assignment of her employment expense to the Mobility unit, or her job duties.

10. In 2016, plaintiff requested and received FMLA from December 5, 2016 to March 6, 2017 for the birth of her first child.

11. Since plaintiff was hired in August 2015, her full cycle recruiting work for the Mobility Services unit had steadily declined and Taylor assumed those duties while plaintiff was on FMLA leave. Despite the decline in plaintiff's full cycle recruiting work, plaintiff still obtained enough other work to keep her working more than forty hours a week.[5]

12. When plaintiff returned to work in March 2017, she was asked to fill in on staffing the Nokia Airscale project – a client project. She complied with this request. The recruiting work on this project was generally outsourced to outside staffing companies, but plaintiff worked to provide assistance with administration, management, scheduling, training, and hiring of new technicians as required by Nokia.[6]

---

[4] Plaintiff attempts to dispute defendants' fact that the expense associated with plaintiff's employment was allocated to the Mobility Services unit. In support, plaintiff cites two portions of plaintiff's deposition transcript: Deposition of Laura Ruddy ("Ruddy Depo. Tr.") at 186:2-4 and Ruddy Depo. Tr. at 61:4-12. To begin with, plaintiff did not provide page 186 of her deposition transcript as part of the excerpts submitted with her opposition brief. Defendants, however, did include that portion of the transcript which asserts that plaintiff understood that she was on the corporate or "KGP Company's cost code budget." Ruddy Depo. Tr. at 186:2-4. Plaintiff also cites to her deposition testimony at page 61, but page 61 does not contain the quoted language on which plaintiff relies, namely that plaintiff was "under HR's cost center." Opp'n at 3. Defendants cite to Taylor's declaration in support as well as the spreadsheets demonstrating that plaintiff was indeed on the Mobility Services unit expense budget. *See* Dkt. 30-4. Accordingly, there is no genuine issue of material fact, because while plaintiff's testimony reflects her understanding that she was transferred to the corporate budget, the record evidence demonstrates that defendants kept the expense of her salary and benefits on the Mobility Services unit budget. It is therefore appropriate to modify the asserted fact to reflect plaintiff's understanding, even though the record evidence that her position was on the Mobility Services unit's budget is undisputed.

[5] Plaintiff disputes the asserted fact that plaintiff's full cycle recruiting work declined and asserts that plaintiff still worked in excess of forty hours a week. Because plaintiff's cited record evidence does not dispute or contradict the asserted fact that plaintiff's *full cycle recruiting* work decreased, there is no genuine dispute of fact. It is, however, appropriate to include plaintiff's additional asserted fact: that she still had enough other work to keep her busy in excess of forty hours a week.

[6] It appears that plaintiff does not dispute the substance of defendants' undisputed fact but asserts that it is incomplete because it does not reflect that plaintiff was also involved in recruiting. To the extent that the deposition testimony relied on by both plaintiff and defendants suggests that plaintiff was also involved with hiring, it is appropriate to include that information in the recitation of undisputed facts.

13. After March 2017, plaintiff's work for Nokia took up ninety percent of her time. The remaining ten percent of her time involved the recruiting work that plaintiff was originally hired to perform.

14. In May 2017, Bluestream joined with KGP Logistics under the brand name KGPCo, but both Bluestream and KGP Logistics remained separate corporate entities. Bluestream and KGP Telecommunications LLC share the same corporate headquarters and address.[7]

15. In June or July 2017, plaintiff informed Taylor that plaintiff was pregnant and expecting her second child in January 2018. Although plaintiff informed Taylor that she would be going out on leave for this second pregnancy, plaintiff had not submitted any FMLA request and plaintiff did not otherwise disclose this pregnancy to anyone at Bluestream.[8]

16. On August 25, 2017, Vincent Briggs, a Training Project Manager for Bluestream assigned to the Airscale project, resigned. At that point, plaintiff began interacting with Ben Thompson, the point person at Nokia managing the training of Nokia technicians assigned to the project. Plaintiff continued to devote ninety percent of her time to the Airscale project and ten percent to internal requisitions.

17. Following Briggs' resignation, Bluestream appointed Phil Dudek to work in the newly created "PMO"[9] position for the Airscale project. Bluestream then began looking for an administrative level employee to provide Dudek with assistance, as Nokia was becoming frustrated with the lack of administrative resources in that regard.[10]

---

[7] As noted *supra*, there is no explanation of how these entities relate or interact.

[8] Plaintiff disputes this fact and asserts that she had conveyed her plan that she was going to use FMLA leave for her second pregnancy and relies on her deposition testimony. Plaintiff's deposition testimony states: "I mean, well, since my plan – I had told them – they knew that I was going on FMLA leave in November. I did remind them a couple of times." Ruddy Depo. Tr. at 80:11-17. Plaintiff never explains who "they" or "them" are nor does she identify a conversation other than the conversation she had with Taylor. The other testimony from plaintiff cited on this topic only refers to plaintiff's discussions with Taylor. *See* Ruddy Depo. Tr. at 109:21-110:14 ("I just told her [Taylor] it could be – it's kind of up in the air," apparently meaning that when and what leave plaintiff would take was up in the air). Accordingly, plaintiff has not effectively disputed defendants' asserted fact and there is no genuine issue of material fact.

[9] The cited email does not define the term "PMO," but plaintiff's complaint defines the term as referring to the "Project Management Office."

[10] Plaintiff disputes that defendants were looking for an administrative level employee. Plaintiff points to testimony from Taylor that plaintiff was interacting with Thompson. This testimony does not undermine the assertion that Bluestream was looking for an administrative level employee. Moreover, both plaintiff and defendants rely on the same email chain discussing Nokia's frustration with available resources. *See* Dkt. 25-4 ("September 12, 2017 Email Chain") at 1. In that same email chain, Jason Taylor writes: "Wowser – it sounds like we need to find an admin." *Id.* This evidence supports defendants' asserted fact, that an administrative employee was needed. Moreover, because the email chain occurred *after* plaintiff began communicating with Thompson and because plaintiff is included on the email, the record evidence demonstrates that plaintiff *was not* the proposed solution to this lack of resources, as plaintiff suggests. Plaintiff's opposition brief also quotes plaintiff as testifying that Thompson "said he wanted [Plaintiff] to be the only point of contact at KGP for him." Opp'n at 5. To begin with, no citation to the record is provided for this quote. Moreover, even if this quote accurately reflects plaintiff's testimony it does not undermine the asserted fact: that defendants were looking for an administrative level employee to assist Dudek. Accordingly, plaintiff has not effectively disputed defendants' asserted fact and there is no genuine

18. Edin Kucanovic, a man, was eventually hired to provide administrative assistance to the Airscale project. Kucanovic interviewed for the position in September 2017 and was hired on October 23, 2017 at the rate of $16.00 per hour. Unlike plaintiff, Kucanovic was not hired to work exclusively for the Mobility Services unit or allocated to the Mobility Services budget. By hiring Kucanovic into an administrative role, some of the administrative duties that plaintiff had performed on the Airscale project were assumed by Kucanovic.[11]

19. Thompson interacted with plaintiff for two months. Thompson was a Nokia employee, not plaintiff's supervisor, and did not have hiring or firing authority over plaintiff. Although Thompson was not a person with authority to hire or fire at Nokia, he was a gatekeeper for access to Nokia.[12]

20. On September 17, 2017, shortly after plaintiff began working with Thompson, plaintiff mentioned in an email to Thompson that she was unable to make a scheduled training because of her "20 week ultrasound to see baby for the first time." Dkt. 25-6 ("September 12, 2017 Ruddy Email").

21. Thompson did not say anything positive or negative in response to plaintiff's disclosure of the upcoming ultrasound.

22. At all times, plaintiff worked remotely and never interacted with anyone, including Thompson, face-to-face.

23. In September 2017 as the close of the fiscal year approached, Della Valle began to consider reducing his unit's expenditures, including elimination of plaintiff's recruiting manager position because the Mobility Services unit no longer needed a full cycle recruiter and

---

dispute of material fact.

[11] Plaintiff disputes defendants' asserted fact in two respects: (i) Kucanovic was not hired to perform administrative work, but to replace plaintiff; and (ii) Kucanovic was still under the Mobility Services unit and Della Valle's supervision. The testimony to which plaintiff cites establishes that Kucanovic took over some roles previously filled by plaintiff, not that Kucanovic was hired to replace plaintiff. *See* Deposition of Tara Taylor ("Taylor Depot Tr.") at 28:16-29:1. As plaintiff put it in her deposition testimony, she was "essentially doing two full-time jobs, and he replaced one of them." Ruddy Depo. Tr. at 217:8-18. Accordingly, it is appropriate to modify defendants' asserted fact to reflect that Kucanovic took over functions previously performed by plaintiff on the Airscale project. Although plaintiff disputes that Kucanovic was not hired exclusively for the Mobility Services unit, the testimony upon which she relies does not relate to Kucanovic at all. Instead, plaintiff relies on her own testimony that Della Valle was "VP of Mobility" and that program managers under his programs were responsible for hiring employees. *See* Ruddy Depo. Tr. at 66:15-19, 68:11-17. This testimony does not refer to Kucanovic or Kucanovic's position, but instead refers generally to program managers under Della Valle's projects. Moreover, plaintiff's testimony regarding Della Valle's role in the Airscale project is far from conclusive that it was his project. Plaintiff testified: "I mean, he always, -- I believe he was – because the Nokia project was like – I guess he was, like, you know, heading it up, so I'm not exactly sure how much or – but he – he headed a little – some part of it." Ruddy Depo. Tr. at 68:11-17. Accordingly, plaintiff points to no evidence on this record and there is no genuine issue of fact that Kucanovic was not hired for the Mobility Services unit, was not allocated to the Mobility Services budget, and did not otherwise report to Della Valle.

[12] Plaintiff disputes defendants' asserted fact only to the extent that she contends that it is incomplete, because it does not state that Thompson was a gatekeeper for access to Nokia. Although this dispute does not appear to be material, it is appropriate to modify the asserted fact to add that Thompson served as a gatekeeper.

plaintiff was no longer performing the recruiting functions that she was hired to do.[13]

24. The administrative work that plaintiff and one other Bluestream employee, Alvina Colvin, did on the Airscale project could be performed by a project coordinator or program manager at the much lower cost of $16.00 per hour as compared to the $115,200 annual salary and benefits paid to plaintiff as a recruiting manager.[14]

25. For these reasons, Della Valle – the same person who recruited and hired plaintiff two years prior as recruiting manager – decided to eliminate plaintiff's recruiting manager position and terminate plaintiff's employment. Following plaintiff's termination, aspects of plaintiff's job duties were going to be distributed to other employees.[15]

26. On October 11, 2017, Della Valle confirmed his decision to eliminate the recruiting manager position in an email to Taylor and Carson Feleay, the Director of Finance. Della Valle stated that he "wanted to include Carson in the discussion as we are collectively working on reducing OPEX [operating expenses] costs for 2018." Dkt. 25-7 ("October 26, 2017 Della Valle Email Chain").

27. As of October 11, 2017, Della Valle was not aware that plaintiff was pregnant.[16]

---

[13] Plaintiff disputes defendants' asserted fact but is unclear which portion of the asserted fact she disputes. It appears that plaintiff disputes the asserted fact only to the extent that the fact suggests that her employment was a cost to the Mobility Services unit. As discussed *supra*, the record reflects that, although plaintiff believed that she was under the corporate budget, her expense was allocated to the Mobility Services unit. *See, e.g.,* Dkt. 30-4. Moreover, plaintiff again quotes her deposition testimony as stating that she was told that she was "under HR's cost center." Opp'n at 6 (citing Ruddy Depo. Tr. at 61:4-12). The quoted language does not appear in the cited portion of plaintiff's deposition. Accordingly, plaintiff has not effectively disputed defendants' asserted fact and there is no genuine dispute of material fact.

[14] Plaintiff disputes that Colvin was an administrative level employee. Both parties rely on plaintiff's testimony that "Avina, who [sic] a project engineer – project manager, to help out with some of the admin duties I was doing." Ruddy Depo. Tr. at 93:3-16. Accordingly, it seems clear that Colvin, even if not an administrative employee, was performing administrative tasks. Thus, defendants' asserted fact has been modified to reflect this testimony and there is no dispute of fact.

[15] Plaintiff disputes the asserted fact on two bases: (i) to the extent that the asserted fact suggests that she was only terminated from one position; and (ii) to the extent that the asserted fact suggests that her role was simply eliminated and not assigned to other people. Although plaintiff's deposition testimony suggests that she was "essentially doing two full-time jobs," the record does not reflect that plaintiff was formally hired for or formally transferred to a new position. *See* Ruddy Depo. Tr. at 217:3-18. Although as discussed *infra*, there is a genuine issue of material fact regarding plaintiff's performance of the project coordinator role, that fact does not have any bearing on defendants' asserted fact: that plaintiff's recruiting manager position was eliminated and that plaintiff was terminated. With respect to this fact asserted by defendants, there is no genuine dispute of fact and plaintiff concedes that there is no dispute as to the asserted fact in her opposition brief. *See* Opp'n at 6, ¶ 25. With regard to plaintiff's second argument, it is appropriate to note, as the deposition testimony reflects, that portions of plaintiff's duties were going to be performed by other employees. Accordingly, the asserted fact will be modified to add the information asserted by plaintiff.

[16] In the motion for summary judgment, defendants relied on Taylor's statement in her declaration that Della Valle did not know of plaintiff's pregnancy and plaintiff's testimony that she had not told Della Valle about her pregnancy. In her opposition brief, plaintiff disputed this fact on the basis that Taylor's declaration failed to lay a proper foundation for asserting what Della Valle knew and that plaintiff's deposition was limited to what plaintiff had told Della Valle. In the reply brief, defendants addressed this critique and provided a declaration from Della Valle stating that he was not aware that plaintiff was pregnant on October 11, 2017. *See* Dkt. 30-11. Plaintiff points

28. Pursuant to Della Valle's instructions, Taylor informed plaintiff that her position would be eliminated on October 25, 2017 and that plaintiff's last day would be Friday, October 27, 2017. Taylor explained to plaintiff that the decision was for budgetary reasons.

29. Although plaintiff had previously mentioned to Taylor the need to take FMLA leave, plaintiff had not submitted any FMLA paperwork for her pregnancy or requested a leave of absence related to her pregnancy as of October 25, 2017. Additionally, plaintiff was not eligible for FMLA leave under Bluestream's FMLA policy, because she had taken 12 weeks of FMLA leave less than a year before.

30. In response to being told that her position was being eliminated, plaintiff – who was due to give birth in January 2018 – proposed an alternative solution, namely that she be placed on leave until she became eligible for FMLA leave and then take 12 weeks of FMLA leave. This alternative solution, proposed on October 26, 2017, was the first time that plaintiff had made a request for FMLA leave concerning her second pregnancy and, because plaintiff had previously taken 12 weeks of FMLA leave for the birth of her first child from December 5, 2016 to March 6, 2017, plaintiff remained ineligible to take another 12-weeks of FMLA leave until December 5, 2017.

31. As part of her proposal, plaintiff acknowledged that, if, at the end of the 12-week period of FMLA leave, there was not room for her elsewhere within the defendant companies she would accept that fact and part ways graciously.

32. Although there was no precedent for plaintiff's proposal and Bluestream was not obligated to accommodate her, Bluestream granted plaintiff's request and offered plaintiff FMLA-like[17] leave from October 30, 2017 to December 5, 2017.

33. By granting plaintiff's request, Bluestream permitted plaintiff to continue to receive health insurance benefits as well as to be eligible for a potential performance bonus for 2017.

34. On December 5, 2017, plaintiff became eligible for FMLA leave and Bluestream placed plaintiff on FMLA leave through February 2, 2018.

35. On January 30, 2018, plaintiff requested that her leave of absence be extended through March 9, 2018 – 19 weeks after her position was originally eliminated – because she had only given birth to her second child two weeks before. Bluestream granted plaintiff's request.

36. In the meantime, on January 18, 2018, Della Valle had confirmed that there was still no need for a "full/time dedicated recruiter for [his] team." Dkt. 25-16 ("January 18, 2018 Email Chain").[18] Taylor, in a prior email, had indicated that recruiting for "One KGPCo" would

---

to no contrary evidence suggesting that Della Valle was aware of plaintiff's pregnancy. Accordingly, there is no genuine dispute of fact that Della Valle was not aware of plaintiff's pregnancy.

[17] Because plaintiff was not eligible for FMLA leave until December 5, 2017, the parties term the leave provided to plaintiff from October 30, 2017 to December 5, 2017 as "FMLA-like leave." This FMLA-like leave was granted as a matter of grace by defendants to accommodate plaintiff.

[18] Plaintiff disputes the asserted fact on the basis that the quoted language does not appear in the email. A review of the January 18, 2018 Email Chain reveals that the quoted language does appear in the portion of the email sent by Della Valle. Accordingly, there is no genuine dispute of fact as to whether there was a need for a dedicated recruiter. Plaintiff also points to additional language in the January 18, 2018 Email Chain that is also appropriate to

proceed "holistically under Bob"[19] and that "Bob is wanting a high level talent located in Faribault so we aren't replacing [plaintiff] but upgrading due to needs of business." *Id.*

37. At the conclusion of plaintiff's FMLA-like leave, FMLA leave, and extension of leave on March 9, 2018, Bluestream confirmed to plaintiff that her position had been eliminated and that her employment would cease, effective "COB on March 9, 2018." Dkt. 29-17 ("March 9, 2018 Letter").

38. No one was hired to replace plaintiff as the recruiting manager nor has Bluestream hired or created a recruiting manager position to work for the Mobility Services unit.[20] Defendants did, however, hire Kucanovic in October 2017 to take on coordination and project management roles on the Airscale project duties that had previously been performed by plaintiff.

39. As part of this litigation, plaintiff claimed that Della Valle made the decision to eliminate her recruiting manager position at the behest of Thompson but admitted that she (plaintiff) had no evidence to support this claim and that she was "guessing." Ruddy Depo. Tr. at 117:1-23.[21] Thompson was rude to plaintiff and plaintiff believed that it was because she was pregnant and because he only wanted one point of contact for the Airscale project. *See* Ruddy Depo. Tr. at 164:15-165:8. 171:18-172:4. In an email, Taylor had also indicated that she had been trying to "smooth the waters with Ben/NOKIA" and that there had been complaints regarding plaintiff's unresponsiveness. Dkt. 29-6 ("October 26, 2017 Della Valle/Taylor Email Chain").

## II.

Defendants have moved for summary judgment on all of plaintiff's claims: (i) Count I: termination of plaintiff's employment under Title VII, as amended by the PDA; (ii) Count II: retaliation under Title VII, as amended by the PDA; and (iii) Count III: FMLA retaliation. In this respect, the standard for summary judgment is too well-settled to require extensive discussion here. Simply put, summary judgment is appropriate when there is "no genuine issue as to any

---

add to defendants' asserted fact.

[19] It is unclear from the record who Bob is and it is immaterial.

[20] Plaintiff disputes the asserted fact that no one was hired to replace her on the basis that her recruiting duties were assigned to other people and that defendants created other similar positions. Plaintiff, however, fails to cite any record evidence in support of this contention. Accordingly, there is no dispute of fact. Plaintiff also asserts that defendants' asserted fact is incomplete because Kucanovic was hired to perform the project coordinator and management roles that plaintiff had filled on the Airscale project. *See* Taylor Depo. Tr. at 28:16-29:1; Ruddy Depo. Tr. at 217:8-18, 223:1-21. It is therefore appropriate to add that information to this undisputed fact.

[21] Plaintiff does not dispute her testimony but argues that the asserted fact is incomplete. It is therefore appropriate to include additional information from the record cited by plaintiff as additional undisputed facts.

material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, at the summary judgment stage, courts must "view the evidence in the light most favorable to…the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

## III.

Plaintiff bases Count I on her termination from two positions, namely as recruiting manager for the Mobility Services unit and as a project coordinator on the Airscale project. Defendant argues that plaintiff has failed to establish that she was treated differently from any non-pregnant person and that there is no inference of discrimination to be drawn from plaintiff's termination. Each of the positions from which plaintiff claims she was terminated is addressed separately below.

## A. Recruiting Manager

Defendant moves for summary judgment on Count I on the ground that plaintiff cannot establish a *prima facie* case of discrimination based on either sex or pregnancy. Plaintiff offers no direct evidence of pregnancy discrimination.[22] Her claims are therefore analyzed under the under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Young v. United Parcel Service, Inc.*, 575 U.S. 206, 228 (2015) (holding that claims under the PDA follow the *McDonnell Douglas* framework). To establish a *prima facie*

---

[22] Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x. 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)).

case of discrimination, plaintiff must show that: (i) she is a member of a protected class; (ii) she was qualified for her job and her job performance was satisfactory; (iii) she suffered an adverse employment action; and (iv) the position remained open or was filled by a similarly qualified applicant outside of the protected class. *See Miles v. Dell, Inc.*, 429 F.3d 480, 485 (4th Cir. 2005) (citations omitted).

Here, the parties focus exclusively on the fourth prong of the *prima facie* test. Plaintiff argues that she satisfies the fourth prong of the *prima facie* case because her duties were shifted to other employees or similar positions. Defendant argues that plaintiff cannot show that she was treated worse than any male or non-pregnant female employee. Defendant is correct. Because plaintiff cannot show that her recruiting manager position remained open or that it was filled by a person outside of the protected class, plaintiff cannot establish a genuine issue of material fact as to the fourth prong of the *prima facie* case. Moreover, plaintiff cannot demonstrate that an inference of discrimination should be drawn because the person who decided to terminate plaintiff from her recruiting manager position, Della Valle, was not aware that plaintiff was pregnant.

Plaintiff first argues that, although her recruiting manager position was eliminated, she was replaced by persons outside her protected class because her job duties were distributed to other employees, namely Taylor. Courts, including the Fourth Circuit, have uniformly held that the redistribution of work to other employees, after eliminating a position, does not constitute replacement sufficient to satisfy the fourth prong of the *McDonnell-Douglas* test.[23] Here, the

---

[23] *See, e.g., Warch v. Ohio Cas. Ins., Co.*, 435 F.3d 510, 519 (4th Cir. 2006) (noting that plaintiff failed to establish fourth prong where undisputed evidence showed plaintiff was not replaced and plaintiff's duties were apparently spread out among existing employees); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994) ("[T]he fact that the duties of a terminated older employee were assumed by a younger individual is not conclusive of age bias."); *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."); *Frieze v. Boatmen's Bank of Belton*, 950 F.2d 538, 540 (8th Cir. 1991) ("Employers often distribute a discharged employee's duties to other members

undisputed facts establish that plaintiff was only dedicating ten percent of her time to the job that she was hired to do, namely recruiting manager, and that her position was eliminated because of budgetary concerns in the Mobility Services unit. It is therefore sensible for Bluestream to redistribute those functions to an existing employee to realize the cost savings of eliminating the recruiting manager position while still ensuring that the necessary work is performed.

Plaintiff also contends that she was replaced because her duties were shifted to other newly created positions. In this regard, plaintiff has failed to submit evidence that permits an analysis and comparison of the positions and persons whom she alleges replaced her. To support her argument plaintiff cited to deposition testimony which was not included in her opposition to defendants' statement of material undisputed facts. Plaintiff argues that her duties were shifted to two other positions: (i) an unspecified position mentioned by Della Valle in an email; and (ii) a KGPCo recruiting position occupied by Rebecca Dodd. *See* Opp'n at 11. Plaintiff has come forward with no evidence regarding the positions to which she refers, the persons occupying the positions, the job duties involved, or the timing of when the positions were filled.

With respect to the first position, plaintiff relies on Della Valle's email that "we aren't replacing [plaintiff] but upgrading due to needs of business" and Taylor's testimony that there would "possibly" be some crossover between plaintiff's eliminated position and the unspecified new position which is now occupied by Celina Steidl. January 18, 2018 Email Chain; Taylor Depo. Tr. at 21:3-7. Plaintiff's deposition is similarly vague. At her deposition plaintiff testified as follows:

> Q:    Do you contend that these five names you've listed here replaced you at
> Bluestream?

---

performing related work for legitimate reasons."); *Culwell v. City of Fort Worth*, 503 F. Supp. 2d 813, 817 (N.D. Texas 2007) ("Transfer of work by a terminated employee to other employees does not constitute 'replacement' in an employment discrimination context.").

A:     No. . . .

— and then, with Celina, I don't think that they hired her to replace me specifically, but it just seemed a little — I mean, I was just — I mean, looking at her LinkedIn profile.[24]  I mean — I don't know — she just — I don't know what to say. I just — yeah.  I don't know if she had replaced me, but I think if anyone on here actually did replace me, it was Rebecca Dodd more than anyone.

...

And then Rebecca did a lot of this — appears to do a lot of the exact same responsibilities that I did.

Ruddy Depo. Tr. at 183:1-22.  Moreover, plaintiff testified that she is "not sure" whether Steidl or Dodd were pregnant at any time during their employment with defendants or whether they worked on the same projects that plaintiff did.  *See id.* at 184:16-23.

Plaintiff has failed to establish that either Steidl or Dodd were outside of her protected class.  There is no record evidence that Steidl and Dodd, both female, were outside of plaintiff's protected class because plaintiff has submitted no evidence regarding whether they were pregnant.  As the Fourth Circuit has sensibly recognized, "a nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).  Here, plaintiff seeks to do just that.  Based on her own limited knowledge, drawn merely from a review of public LinkedIn pages, plaintiff seeks to draw the inference that: (i) Dodd and Steidl were not pregnant; (ii) were hired after plaintiff's position was eliminated; (iii) were hired for the Mobility Services unit; and (iv) were hired to perform the same sort of recruiting functions that plaintiff performed.  As the Fourth Circuit has noted, where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, there must be "enough common features between the individuals to allow [for] a meaningful comparison."  *Haywood v.*

---

[24] LinkedIn is an online social network for professionals whereby users create their own profiles and job descriptions.

*Locke*, 387 F.App'x 355, 360 (4th Cir. 2010) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)).[25] It is impossible to determine whether Steidl or Dodd are fair comparators or replacements because only speculation can fill the gaps as to their characteristics, positions, and responsibilities and as to whether they were pregnant. Moreover, plaintiff herself testified that no one at Bluestream was treated more favorably than her. *See* Ruddy Depo. Tr. at 215:13-16.[26] Accordingly, plaintiff has not established a genuine issue of material fact by relying on how similarly situated persons outside of her protected class were treated. Thus, her discrimination claim based on her termination from the recruiting manager position fails.

Finally, defendants argue that there is no reason to draw an inference of discrimination from plaintiff's termination because the undisputed facts establish that Della Valle made the decision both to hire and to terminate plaintiff and because the undisputed facts establish that Della Valle did not know plaintiff was pregnant with her second child. The Fourth Circuit has held that there is an inference of non-discrimination where the same person hired and fired a person within a protected class. *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Here, however, while Della Valle knew plaintiff was a woman when he hired her she was not pregnant at that time and his role in hiring and firing plaintiff does not speak to any animus Della Valle may feel towards pregnancy or pregnant women. On the other hand, any inference of discrimination cannot be established where, as here, the undisputed factual record demonstrates

---

[25] *See also Ketema v. Midwest Stamping, Inc.*, 180 F.App'x 427, 428 (4th Cir. 2006) (affirming summary judgment where evidence was insufficient to show proposed comparators were similarly situated).

[26] In her deposition, plaintiff was asked the following question and gave the following response:

> Q:     Is there anyone who was in a similar position as you at Bluestream who you contend was treated more favorably than you?
> A:     No.

Ruddy Depo. Tr. at 215:13-16.

that the decision-maker, Della Valle, did not know that plaintiff was pregnant.[27]  Accordingly, because Della Valle, the decision-maker with respect to the recruiting manager position, did not know that plaintiff was pregnant, plaintiff cannot establish an inference of discrimination with respect to her termination from that position.

In sum, plaintiff fails to establish the fourth prong of her *prima facie* case because she cannot show that she was replaced by a person outside her protected class.  Additionally, no inference of discrimination can be drawn because Della Valle, who terminated plaintiff as recruiting manager, had no knowledge that plaintiff was pregnant.  Accordingly, defendants' motion for summary judgment must be granted with respect to plaintiff's claim of pregnancy discrimination in her termination from the recruiting manager position.

### B. Project Coordinator

Plaintiff argues that her discrimination claim also includes her termination from the project coordinator role on the Airscale project and that Kucanovic (a man) and Colvin (a woman) replaced her in that role.  Defendant argues that plaintiff never held the project coordinator position because she remained on the Mobility Services unit expense budget and retained her managing recruiter salary.  Although the summary judgment record reflects that plaintiff was not formally transferred to a project coordinator position, there is a question of fact regarding whether defendants had effectively or constructively transferred plaintiff to that project coordinator role such that her removal from that role constitutes a separate termination that must be analyzed under Title VII.  A reasonable jury could find that plaintiff had been transferred to a

---

[27] *See Kator v. Doctors Band,* 133 F.3d 915, at *2 (4th Cir. 1998) (unpublished) (affirming summary judgment because plaintiff could not establish *prima facie* case where decision-maker did not know she was pregnant); *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005-07 (7th Cir. 2001) (plaintiff failed to establish *prima facie* case of discrimination in part because, even though she was visibly pregnant, she had not informed the employer of her pregnancy and could not prove that her employer was aware of her pregnancy); *Geraci v. Moody-Tottrup, Int'l, Inc.,* 82 F.3d 578, 582 (3d Cir. 1996) (plaintiff failed to establish *prima facie* case of discrimination because she could not prove that her managers were aware of her pregnancy).

project coordinator role, because her supervisor changed from Della Valle to Taylor and because ninety percent of her time was dedicated to the Airscale project. Moreover, triable issues of fact exist regarding whether plaintiff suffered discrimination when defendants hired Kucanovic for a permanent project coordinator role instead of formally placing plaintiff in that role after the elimination of her recruiting manager position.

First, there is a question of fact regarding whether plaintiff was transferred to the project coordinator role such that it constituted a second position from which she was terminated. Although the undisputed facts show that plaintiff remained on the Mobility Services unit expenses and retained her recruiting manager salary, it is also undisputed that her supervisor changed, and that ninety percent of her work was in the project coordinator role. Moreover, it is undisputed that plaintiff understood that she had been transferred to the corporate budget. *See* Ruddy Depo. Tr. at 186:2-4. There is thus a question whether together these facts establish that plaintiff was transferred or constructively transferred to the project coordinator position. This question is material because if plaintiff was in the project coordinator role, then her termination would be analyzed under the *McDonnell-Douglas* burden framework, but if she was not, then defendants had no obligation to transfer her to the project coordinator position upon her termination.[28]

There is no dispute on this record that plaintiff's claim of pregnancy discrimination based on her removal from the project coordinator position satisfies the first three prongs of the *prima*

---

[28] *See Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir. 1995) ("[A]n employer incurs no duty to transfer an employee to another position when it reduces its work force for economic reasons."); *Ridenour v. Lawson, Co.*, 791 F.2d 52, 57 (6th Cir. 1986) ("Where an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company."); *Anderson v. Randstad Staffing Servs., Inc.*, No. 02-cv-19, 2003 WL 21920925, at *3 (E.D. Tenn. June 19, 2003) ("An employer is under no obligation to transfer an employee to another position within the business when the employee's position is eliminated . . ."); *King v. Marriott Int'l, Inc.*, No. 9:05-1174, 2007 WL 951738, at *10 (D.S.C. Mar. 27, 2007) ("Generally, an employer has no duty to an employee to transfer him to another position in the company when the employer reduces or restructures its workforce . . .").

*facie* case. Defendants argue only that plaintiff cannot meet the fourth prong, namely that plaintiff was treated less favorably than persons outside her protected class or that she was terminated in circumstances giving rise to an inference of discrimination. Testimony from Taylor, who was defendants' Rule 30(b)(6) witness, establishes that there are triable issues of fact regarding whether plaintiff was discriminated against based on pregnancy when she was not retained in the project coordinator role. Taylor testified as follows:

> Q:   Was Ms. Ruddy ever considered for that role or position?
>
> A:   No.
>
> Q:   No one from Bluestream ever asked if she wanted to continue in that role after the recruiting manager position was being eliminated?
>
> A:   At that time, she was going on leave.
>
> Q:   What was that leave for?
>
> A:    FMLA.
>
> Q:   Do you know what the underlying issue was?
>
> A:   I do.
>
> Q:   What was that?
>
> A:   Pregnancy.

Taylor Depo. at 29:14-30:5. Taylor's testimony is sufficient to establish the fourth prong of the *prima facie* case, because it gives rise to an inference of discrimination, *i.e.* that plaintiff was removed from/not permanently placed in the project coordinator position because she was pregnant. *See* 42 U.S.C. § 2000e(k) (the term "because of sex" includes "because of or on the basis of pregnancy"). Defendant has not offered a legitimate, non-discriminatory reason for this decision in its motion for summary judgment. Accordingly, considering the evidence in the light most favorable to plaintiff as the non-movant, this record contains sufficient evidence such that a reasonable jury could find that plaintiff was in the project coordinator position and that the reason she was not retained in that position was her pregnancy.

In summary, there are two genuine issues of material fact for a jury to consider: (i)

whether plaintiff was transferred or constructively transferred to the project coordinator position on the Airscale project; and (ii) if so, whether plaintiff was terminated or not retained in the project coordinator position because of her pregnancy. Because these genuine issues of material fact need to be resolved by a jury, summary judgment with respect to plaintiff's claim of pregnancy discrimination based on her removal from the project coordinator role must be denied.

## IV.

Count II of plaintiff's complaint is based on retaliation for plaintiff's alleged reports to Taylor of discrimination under Title VII as amended by the PDA. Plaintiff argues that she complained to Taylor that Thompson was discriminating against her based on pregnancy and that she was subsequently fired. To establish a *prima facie* case of retaliation, plaintiff must prove three elements: (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). Defendants argue that plaintiff did not engage in protected activity and cannot show any causal connection between the alleged protected activity and her termination. Defendant is correct on both points. Accordingly, summary judgment must be granted for defendants in this regard.

Protected activity does not include generalized employment related complaints unrelated to Title VII/PDA-prohibited discrimination.[29] Here, to satisfy the requirement that she engaged

---

[29] *See e.g., White v. Rice*, 46 F.3d 1130, at *4 (table) (4th Cir.1995) (per curiam) ("[Plaintiff's] contention that his generalized verbal complaints to co-workers and supervisors constituted protected activity ... lacks merit. Such comments are distinguishable from cases where informal opposition to an employer's actions was considered protected activity under Title VII ."); *Flax v. Delaware*, 329 F. App'x 360, 364 (3d Cir. 2009) (complaints unrelated to discrimination did not constitute protected activity); *Sung Kun Kim v. Panetta*, No. 11-cv-1880, 2012 WL 3600288, at *17-18 (E.D.Va. Aug. 21, 2012) (no protected activity where plaintiff could not identify a basis for discrimination in her complaints); *Sara Kaye Ruffner v. MD OMG EMP LLC*, No. 11–1880, 2012 WL 3542019 at * 3 (D. Md. Aug. 13, 2012) ("Protected activity does not include opposition to all 'unlawful practices' or 'practices the employee simply thinks are somehow unfair'; the employee must have 'actually opposed employment practices made unlawful by the [anti-discrimination statute]").

in protected activity, plaintiff relies solely on Taylor's testimony regarding the complaint made by plaintiff regarding Thompson. *See* Opp'n at 14 (citing Taylor Depo. Tr. at 32:20-35:4).[30] In that testimony, Taylor states that the only complaint plaintiff made regarding Thompson was "[j]ust that he was rude." Taylor Depo. Tr. at 32:20-22. Indeed, plaintiff, in her own deposition, denied that she informed Taylor that Thompson "was harassing [her] because [she was] pregnant." Ruddy Depo. Tr. at 92:1. Plaintiff's general complaint of rudeness does not constitute protected activity and plaintiff therefore fails to satisfy the first prong of the *prima facie* test.

Moreover, even assuming *arguendo* that plaintiff engaged in a protected activity related to pregnancy or sex, there is a lack of causal connection between the alleged protected activity and her termination. To begin with, plaintiff cannot demonstrate that she was terminated from the managing recruiter position *because of* her protected activity where plaintiff has submitted no evidence that Della Valle, the applicable decision-maker, was aware of her protected activity. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it was unaware, the employer's knowledge that plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case.").[31] Moreover, plaintiff's own testimony discloses that she would be merely "guessing" as to whether Della Valle knew of her complaints. Ruddy Depo. Tr. at 117:12-15. Plaintiff also points to the October 26, 2017 Della Valle/Taylor Email Chain where Taylor asserts that she had to "smooth the waters with Ben/NOKIA." October 26, 2017 Della Valle/Taylor Email Chain at 1. That email, however,

---

[30] Although plaintiff cites pages 32 through 35 of Taylor's deposition, plaintiff has not provided page 34 of the deposition transcript. Accordingly, that portion of the transcript is not part of the record on summary judgment.
[31] *See also Shun-Lung Chao v. Int'l Business Machines Corp.*, 424 F. App'x 259 (4th Cir. 2011) (affirming grant of summary judgment where "[t]here is nothing in the record to suggest that Chao's manager, Donna Hardee, . . . actually knew of Chao's protected activities at the time she made her decision").

was sent *after* Della Valle had made and communicated the decision to terminate plaintiff from the managing recruiter position and refers only to actions taken by Taylor – who was not the decision-maker. *See id.* Accordingly, plaintiff cannot show a causal nexus between her complaints regarding Thompson's rudeness – assuming that such complaints constituted protected activity (which they do not) – and her termination from the managing recruiter position.

With respect to the project coordinator position, plaintiff argues that Taylor's "smooth the waters" comment suggests a retaliatory animus. The October 26, 2017 Della Valle/Taylor Email Chain does not, however, suggest such an animus. Instead, the October 26, 2017 Della Valle/Taylor Email Chain explains that Taylor was required to "smooth the waters" because "[t]here have actually been complaints about [plaintiff] and her unresponsiveness." October 26, 2017 Della Valle/Taylor Email Chain at 1. The October 26, 2017 Della Valle/Taylor Email Chain suggests that Taylor was not taking any action *because of* plaintiff's complaints but *because of* complaints by the client, namely Nokia and Thompson. Additionally, emails submitted by defendants demonstrate plaintiff's unresponsiveness to requests by Thompson. *See* Dkt. 30-9 ("Laura, I have tried to contact you several times over the last week and no response."). Moreover, as discussed *supra*, Taylor's deposition testimony establishes that the motive for not retaining plaintiff in the project coordinator role was *not* retaliation for her complaints regarding Thompson, but because of plaintiff's pregnancy and the associated leave that she would need to take. *See* Taylor Depo. Tr. at 29:14-30:5. Thus, on this summary judgment record, there is no evidence that defendants retaliated against plaintiff because of any protected activity when defendants did not place plaintiff in the project coordinator role.

In short, plaintiff cannot show either that she engaged in any protected activity or that she

was terminated because she engaged in a protected activity. Accordingly, there is no triable issue of fact on plaintiff's retaliation claim under Title VII/the PDA and summary judgment must be granted in favor of defendants.

## V.

Plaintiff's final count asserts that she was retaliated against for seeking to obtain FMLA leave. To establish an FMLA retaliation claim, a plaintiff must show that she "engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016). Plaintiff argues that she informed Tyalor of her intent to take FMLA leave and that Taylor considered plaintiff's intent to take FMLA leave when Taylor did not offer plaintiff a permanent project coordinator position.[32] Defendants argue that plaintiff was not eligible for FMLA leave and that plaintiff cannot show a causal nexus because, despite eliminating her position, defendants permitted plaintiff to take FMLA leave as well as FMLA-like leave.[33] Because plaintiff concedes that she was not eligible for FMLA leave, she could not have engaged in protected activity and cannot establish her *prima facie* case. Accordingly, defendants' motion for summary judgment must be granted.

A threshold issue raised by defendants' motion for summary judgment is whether

---

[32] It is worth noting that plaintiff's argument regarding FMLA retaliation appropriately focuses solely on the projection coordinator position. Plaintiff cannot establish a FMLA retaliation claim based on the recruiting manager position for the same reason that her Title VII/PDA retaliation claim fails, namely Della Valle – the decision-maker – did not know that plaintiff was pregnant or intended to use FMLA leave. *See Dowe*, 145 F.3d at 657 (holding, in Title VII case, that "by definition, an employer cannot take action because of a factor of which it was unaware"); *Wright v. Southwest Airlines*, 319 F. App'x 232, 234 (4th Cir. 2009) (affirming summary judgment where employer produced affidavit that decision maker was unaware of plaintiff's request for FMLA leave); *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (holding, in FMLA retaliation case, that "one cannot have been motivated to retaliate by something he was unaware of").

[33] It is again worth noting that defendants granted plaintiff this "FMLA-like" leave as a matter of grace, when plaintiff was ineligible for FMLA leave and when defendants had already decided to terminate her recruiting manager position.

plaintiff was an eligible employee under the FMLA and thus entitled to the FMLA's protections against retaliation. She was not. Plaintiff does not address this argument in her opposition brief. *See* Opp'n at 15-16.[34] Under the FMLA, an employee is only entitled to "a *total* of 12 work weeks of leave during any 12-month period." 29 U.S.C. § 2612(a)(1) (emphasis added). Thus, an employee is required to "reestablish FMLA eligibility before taking leave in a new twelve-month FMLA period." *Davis v. Michigan Bell Tel. Co.*, 543 F.3d 345, 352 (6th Cir. 2008).[35] Here, it is undisputed that plaintiff was ineligible for FMLA leave until December 2017.[36] Accordingly, at the time plaintiff was terminated in October 2017, plaintiff was not eligible for FMLA leave.[37]

There is a conflict of authority amongst district courts regarding whether an employer can be held liable for retaliation under the FMLA where the employee was not eligible for FMLA

---

[34] In such circumstances, many courts have held that a failure to respond is "grounds for the Court to deem these arguments conceded." *Ameur v. Gates*, 950 F. Supp. 2d 905, 918 n. 4 (E.D. Va. 2013); *see also Intercarrier Commc'ns, LLC v. Kik Interactive, Inc.*, No. 3:12-cv-771, 2013 WL 4061259, at *3 (E.D. Va. Aug. 9, 2013) (noting that where a party fails to respond to an argument it is "effectively conceding" the argument). Here, defendants are entitled to summary judgment on plaintiff's FMLA retaliation claim as a matter of law based on the merits, but plaintiff has also abandoned her claim by not responding to defendants' motion for summary judgment with respect to this issue.

[35] *See also Smith v. Medpointe Healthcare, Inc.*, 338 F. App'x 230, 233 n. 5 (3d Cir. 2009) ("Smith would not have been eligible to take FMLA leave in 2003 before July 7 because she had already taken one twelve-week leave period within the prior twelve months.").

[36] *See* Dkt. 25 at 9-10, ¶ 33 ("she remained ineligible to take another 12 weeks of FMLA leave until December 5, 2017"); Opp'n at 7, ¶ 33 ("Plaintiff does not dispute Defendants' UMF No. 33.").

[37] The FMLA provides that an employer may choose one of four methods for determining the 12-month period in which the 12 weeks of leave entitlement occurs. *See* 29 C.F.R. § 825.200(b). It appears from this record that defendants chose the "12-month period measured forward from the date any employee's first FMLA leave under paragraph (a) begins." *Id.* § 825.200(b)(3). The record does not, however, specifically identify the calculation method used. It may also be that plaintiff was ineligible for FMLA leave because she had not worked "at least 1,250 hours during the 12-month period immediately before the date when the leave is requested to commence." Dkt. 25-8 ("FMLA Policy"); 29 U.S.C. § 2611(2) (eligible employee means an employee who has worked for at least 1,250 hours of service during the previous 12-month period). Neither party submitted any evidence regarding how many hours plaintiff had worked in the previous 12-month period. In any event, the lack of clarity on this point is not dispositive, as it is undisputed on this summary judgment record that plaintiff was ineligible for FMLA leave. *See* Dkt. 25 at 9, ¶ 29 ("she was not eligible for FMLA leave under Bluestream's FMLA policy"); Opp'n at 7, ¶ 29 ("Plaintiff does not dispute Defendants' UMF No. 29.").

leave. *See Gleaton v. Monumental Life Ins. Co.*, 719 F. Supp. 2d 623, 628-29 (D.S.C. 2010) (noting conflict among district courts). There is also a conflict among district courts within the Fourth Circuit. *Compare Gleaton*, 719 F. Supp. 2d at 629 (holding that an employee may bring a retaliation claim under the FMLA even if terminated before becoming FMLA eligible) *with Jacobs v. UPS, Inc.*, No. 3:15-cv-381, 2016 WL 8192993, at *2 (W.D.N.C. Dec. 5, 2016) (holding that a plaintiff who did not satisfy 1,250 hour requirement "cannot maintain a FMLA retaliation claim because he cannot establish the first element of the prima facie claim for FMLA retaliation – that he engaged in 'protected activity'").[38] This Court has previously held that, where a plaintiff is not an "eligible employee" under the FMLA, he has failed to state a claim of retaliation under the FMLA. *See Bonnano v. Va. Land & Improvement Corp.*, No. 1:13-cv-710, 2014 WL 5389908, at *1 (E.D. Va. Mar. 12, 2014).[39]

The *Bonnano* decision represents the more appropriate analysis of plaintiff's claim, namely that, in order to state an FMLA retaliation claim, plaintiff must be eligible under the FMLA. It is appropriate to require plaintiffs to become eligible for FMLA leave before permitting them to claim the protections of a FMLA retaliation claim, because otherwise employees could request FMLA leave at any time to either forestall their termination or create a FMLA cause of action.

Although there does not appear to be a Fourth Circuit case directly on point, this analysis

---

[38] *See also Rogers v. Bell Helicopter Textron Inc.*, No. CA3–99–CV–988–R, 2000 WL 1175647 (N.D. Tex. Aug. 17, 2000) (finding that a FMLA retaliation claim failed because the plaintiff was not entitled to FMLA leave); *Wemmitt–Pauk v. Beech Mountain Club*, 140 F. Supp. 2d 571, 581 (W.D.N.C. 2001) (granting summary judgment to an employer on a FMLA retaliation claim because the "Plaintiff never engaged in a 'protected activity' under the FMLA; that is, she was not eligible for FMLA leave"); *Morehardt v. Spirit Airlines, Inc.*, 174 F.Supp.2d 1272, 1280 (M.D. Fla.2001) (finding that an employee who was not eligible for FMLA leave could not establish a retaliation claim because the employee did not engage in a protected activity).

[39] This Court has also held that a plaintiff cannot establish a FMLA retaliation claim where he is not eligible for FMLA leave because he did not have an "FMLA qualifying condition." *Swann v. US Foods, Inc.*, No. 1:14-cv-1409, 2015 WL 3793739, at *7 (E.D. Va. June 17, 2015).

appears to be appropriate given the Fourth Circuit's decisions in other FMLA cases. For example, in *Moticka v. Weck Closure Systems*, 183 F. App'x 343 (4th Cir. 2006), the Fourth Circuit noted that at the time that plaintiff was terminated she had not worked the 1,250 hours required and thus was not eligible for FMLA leave. *Id.* at 349. Although the Fourth Circuit did not specifically address FMLA retaliation, it held that plaintiff "failed to show *any entitlement* to coverage under the FMLA, let alone a *violation of the FMLA*." *Id.* (emphasis added). [40] Similarly, plaintiff here cannot show coverage under the FMLA or a violation of the FMLA because she cannot meet this threshold of demonstrating eligibility. Additionally, in *Babcock v. Bellsouth Advertising and Publishing Corp.*, 348 F.3d 73 (4th Cir. 2003), the Fourth Circuit held that a plaintiff who went on leave before working at a company for 12 months was not an "eligible employee" under the FMLA. 348 F.3d at 77. In that case, an employee took leave before becoming eligible under the FMLA and the Fourth Circuit characterized that leave as "an unexcused absence." *Id.* Ultimately, however, the Fourth Circuit found that, because the employer did not terminate the plaintiff for her unexcused absence, the plaintiff became an eligible employee and was entitled to use FMLA leave. *Id.* at 78. Here, plaintiff was not an eligible employee and the decision to terminate plaintiff's employment was made *before* plaintiff became eligible. Accordingly, under the reasoning of *Babcock* and *Moticka*, plaintiff was not an eligible employee and not entitled to FMLA coverage, including retaliation protections.

Because on this summary judgment record it is undisputed that hearing was not eligible for FMLA leave in October 2017, plaintiff cannot establish a *prima facie* case of FMLA

[40] Importantly, when addressing that plaintiff's claim for retaliation based on age discrimination, the Fourth Circuit noted that "the inference of retaliatory motive is undercut . . . by the favorable treatment [plaintiff] received from July 2000 until her termination." *Id.* at 352. Similarly, the inference of retaliatory motive here is undercut by defendants grant of "FMLA-like" leave when plaintiff was ineligible for FMLA leave, granting FMLA leave when plaintiff became eligible (because of the FMLA-like leave), and then extending her leave beyond 12-weeks. Ultimately, plaintiff received 19 weeks of leave when she was not entitled to any leave, which undercuts an inference of retaliatory motive.

retaliation. Accordingly, defendants' motion for summary judgment must be granted in this regard.

## VI.

For the reasons set forth above, defendants' motion for summary judgment will be granted in part and denied in part. Specifically, the motion must be granted with respect to: (i) plaintiff's claims of pregnancy discrimination related to her termination from the recruiting manager position; (ii) plaintiff's claims of retaliation under Title VII, as amended by the PDA; and (iii) plaintiff's claims of retaliation under the FMLA. Defendants' motion for summary judgment must be denied with respect to plaintiff's claim of pregnancy discrimination related to defendants' failure to retain plaintiff in the project coordinator position.

An appropriate order will issue separately.

The Clerk is directed to provide a copy of this Opinion to all counsel of record.

Alexandria, Virginia
March 12, 2020

T. S. Ellis
Un   T. S. Ellis, III
United States District Judge